WO

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Isadore Baptisto,                    )   No. CV 03-1393-PHX-SRB
                                     )
            Plaintiff,               )   **OPINION AND ORDER**
                                     )
vs.                                  )
                                     )
                                     )
Charles R. Ryan, et al.,             )
                                     )
            Defendants.              )
                                     )
                                     )
_____)

Plaintiff Isadore Baptisto, a prisoner in the custody of the Arizona Department of Corrections ("ADOC"), filed this *pro se* action under 42 U.S.C. § 1983.  At issue are Plaintiff's Motion for Summary Judgment (Doc. 35) and a Cross-Motion for Summary Judgment filed by Defendants (Doc. 50).  Plaintiff also moves to strike portions of Defendants' Statement of Facts, although Plaintiff's motion in that regard was not separately filed, but was included in Plaintiff's "Motion of Disputed Facts in Response to Defendants' Cross-Motion for Summary Judgment and Defendants' Statement of Facts" (Doc. 60).

I.      **BACKGROUND**[1]

      A.      **Security Threat Group Validation**

Plaintiff is an inmate in Special Management Unit II ("SMU II"), a Supermax[2] prison in Florence, Arizona reserved for death row inmates, inmates under investigation for protective custody, inmates with high classifications[3], and validated members of Security Threat Groups ("STGs"), also known as prison gangs.

Every prisoner in the ADOC receives a Correctional Classification Profile ("CCP") after a hearing with the Institutional Classification Committee ("ICC").  The prisoner receives prior notice of this hearing, has an opportunity to present evidence, is informed of his right to remain silent, and receives a written copy of the ICC's determination.  The CCP is a composite of the prisoner's public risk score, institutional risk score, medical and health care needs risk score, mental health care needs score, and various other scores which quantify different aspects of the prisoner's needs.  Each of these scores is, in turn, compiled from various elements.  For example, the Public Risk Score considers eight elements: the severity of the current offense, the extent of violence in the current offense, the use of a weapon in the current offense, the escape history, the history of violence, the confinement history, the

---

[1]These facts are drawn from documents submitted by both parties in support of their motions for summary judgment, and from Plaintiff's verified pleadings and motions, which may be treated as affidavits to oppose summary judgment to the extent that they are "based on personal knowledge" and "set[] forth specific facts admissible in evidence."  *See Keenan v. Hall,* 83 F.3d 1083, 1090 n.1 (9th Cir. 1996).

[2]The National Institute of Corrections defines a Supermax prison as, "[a] freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates who have been officially designated as exhibiting violent or seriously disruptive behavior while incarcerated.  Such inmates have been determined to be a threat to safety and security in traditional high-security facilities and their behavior can be controlled only by separation, restricted movement, and limited access to staff and other inmates."  *Austin v. Wilkinson,* 189 F. Supp.2d 719, 722 n.2 (N.D. Ohio, 2002) (quoting Chase Riveland, *Supermax Prisons: Overview and General Considerations* 3 (1999)).

[3]The process and purpose of prisoner "classification" will be discussed below.

estimated length of confinement, and the detainer status.    The CCP is used, among other things, to determine in which ADOC prison an inmate will be incarcerated.

In 1997, in response to the growing threat that STGs posed to the safe operation of the ADOC's prisons, the ADOC implemented Departmental Order ("D.O.") 806.  Under D.O. 806, once an inmate is validated as an STG member, his Public and Institutional Risk Scores are both increased to the maximum five out of five, and the inmate is automatically transferred to SMU II.  After validation, a prisoner can be transferred out of SMU II only if he renounces his STG membership and formally debriefs prison officials, a process in which the inmate provides prison officials with information about other gang members and gang activity.  The stated purpose of debriefing is not to gather evidence to be used in criminal prosecution, but to gain information about the operation and structure of STGs so as to weaken their influence, and to learn if particular inmates require protection from STG members.

When prison officials suspect that an inmate is a member of an STG, they conduct an investigation, in which they attempt to gather as much information as possible to verify the inmate's STG status.  This information comes from several sources: current STG members, debriefing by former STG members, Criminal Investigation Units and other criminal justice agencies, random searches of the inmate's cell, an examination of the inmate's body for STG-related tattoos, monitoring of the inmate's telephone calls, mail and interactions with other inmates, and documentation of STG-related activity such as assaults, extortion and disturbances.

The culmination of each investigation is a hearing similar to the one each prisoner receives in formulating his CCP.  Like in the CCP hearing, the inmate is given advance notice to allow him an opportunity to gather evidence, and is informed of his right to remain silent.  Absent special security concerns, the inmate is allowed to be present at the hearing and present evidence.  After reviewing the prisoner's records and listening to the evidence, the hearing officers render a decision in writing, which is provided to the inmate, who may appeal his validation to the STG Validation Committee.

1    Validated STG members, like all ADOC inmates, receive periodic classification

2    reviews.  Like at the initial classification hearing, prisoners receive written notice, have an

3    opportunity to present evidence, are informed of their right to remain silent, and receive a

4    written explanation of the reasons for their classification.  Validated STG members, however,

5    can only affect their CCPs by renouncing their gang membership and successfully

6    completing the debriefing process.

7    On April 4, 2002, the ADOC validated Plaintiff as a member of the "Warrior Society,"

8    a prison gang that meets the ADOC's definition of an STG, and he was transferred to SMU

9    II.  Plaintiff was given a notice of the impending validation, and was advised of his right to

10   appear at the hearing and to request witnesses.  The notice also informed Plaintiff of the

11   evidence which led the ADOC to believe that he was a member of the Warrior Society: the

12   presence of an "STG Specific tattoo of the Warrior Society," on Plaintiff's neck, and the

13   presence of Plaintiff's name on a Warrior Society membership list.

14   Plaintiff unsuccessfully appealed his validation, and was transferred to SMU II on

15   June 20, 2002.  He has received classification reviews every six months, choosing each time

16   not to renounce his STG membership and debrief prison officials.  As such, he has remained

17   an inmate in SMU II.

18       **B.     Conditions in SMU II**

19   Plaintiff, like all other validated STG members, leads a heavily restricted life in SMU

20   II.  He remains isolated in his cell for 165 hours per week.  His cell is illuminated twenty-

21   four hours per day to allow security checks, but the lights are dimmed at night.

22   The cell contains a sink, a toilet and a bed.

23   While Plaintiff may speak with inmates in other cells, he is allowed no face-to-face

24   communication with them, nor can he pass notes or share legal documents with them.

25   Plaintiff can have visitors, but only one visit per week for a maximum of two hours.  During

26   that time, Plaintiff is separated from his visitors by glass, so no touching can occur.  Plaintiff

27   is allowed one five-minute phone call per week and is ineligible for compassionate escorted

28   leave.  He can also send and receive mail.

Plaintiff is permitted three showers per week, which coincide with the three, one-hour out-of-cell exercise sessions to which he is entitled each week. These exercise sessions occur in a recreation area, which has a cement floor, twenty-foot high cement walls, and a steel mesh top which allows fresh air and sunlight to enter. Only one inmate at a time is allowed in the recreation area. Inmates are permitted unlimited in-cell exercise.

Plaintiff's diet is controlled by a nutritionist. Plaintiff receives three meals a day on weekdays and two per day on weekends. Plaintiff cannot purchase food from the commissary, but may purchase other things such as hygiene-related items, vitamins, a television, a walkman, and clothes. Plaintiff has lost 75 pounds since his transfer to SMU II.

Plaintiff may speak to the prison staff several times per day, and he has access to counselors, with whom he may speak face-to-face five times per week. Plaintiff is ineligible for work, vocational, recreational or education programs, but may do in-cell programs. A library containing legal materials is available to Plaintiff, who can check out materials several times per week.

On July 22, 2003, Plaintiff, representing himself, filed a three-count complaint under 42 U.S.C. § 1983, seeking declaratory and injunctive relief. The first count alleges that his placement into SMU II as well as his classification review hearings violate his right to due process under the Fourteenth Amendment of the United States Constitution. The second count alleges that his conditions of confinement in SMU II violate the Eighth Amendment's prohibition of cruel and unusual punishment. The third count alleges that Defendants improperly retaliated against him by placing him in SMU II only because Plaintiff exercised his right to remain silent and refused to debrief prison officials.

On October 12, 2004, Plaintiff filed a motion for summary judgment. On January 13, 2005, Defendants filed their response, coupled with a cross-motion for summary judgment.

## II.     LEGAL STANDARDS AND ANALYSIS

### A.     Motion to Strike

1    Plaintiff moves to strike various portions of Defendants' Statement of Facts. Plaintiff
2    references no authority for this request, but asserts that the referenced portions are irrelevant,
3    misleading or untrue.

4    Federal Rule of Civil Procedure 56 provides no basis for striking a statement of fact
5    merely because Plaintiff asserts facts to the contrary.   Nor does Federal Rule of Civil
6    Procedure 12(f), which relates only to pleadings, provide such a basis.  *Compare* Fed. R. Civ.
7    P. 7(a) (defining pleadings as complaint, answer, cross claim, third-party complaint and
8    reply) *with* Fed. R. Civ. P. 7(b) (identifying motions and other papers).  *See Phinney v.*
9    *Paulshock*, 181 F.R.D. 185 (D.C.N.H. 1998), affirmed 199 F.3d 1 (1st Cir. 1999) (motion
10   is not "pleading" for purposes of motion to strike pleadings); *Wright & Miller*, 7. 5 Fed. Prac.
11   & Proc. Civ.3d § 1183 (same).  Nor does Rule 103, Federal Rules of Evidence, which relates
12   to the striking of evidence, not papers filed with the Court.  Defendants' Statement of Facts
13   is not evidence.

14   Plaintiff could seek to strike the portions of the declarations that correlate to and
15   support the allegations in Defendants' Statement of Facts.  *See U. S. for Use and Benefit of*
16   *Austin v. Western Elec. Co.*, 337 F.2d 568, 575 (9th Cir. 1964) (acknowledging propriety of
17   motion to strike affidavit submitted in support of motion for summary judgment); *Allen v.*
18   *Scribner*, 812 F.2d 426, 435 (9th Cir. 1987) ("If a party fails to move to strike an affidavit
19   that is allegedly defective under Rule 56(e), he waives any objection to it."). However,
20   Plaintiff does not request that the declarations be stricken, only the Statement of Facts, and
21   Defendants have responded on this basis.  For the Court to now read into Plaintiff's motion
22   a wholly different request would be patently unfair.

23   Plaintiff having failed to show a basis for his request, the motion to strike will be
24   denied.  However, to the extent that the allegations may be irrelevant, conclusory, or
25   otherwise not properly supported in accordance with Federal Rule of Civil Procedure 56,
26   they may be appropriately discounted by the Court in resolving the motions for summary
27   judgment.

28   **B.    Qualified Immunity**

1    Defendants argue that the Plaintiff's complaint should be dismissed because they are

2    entitled to qualified immunity.  However, qualified immunity is only an immunity from a suit

3    for damages.  "Qualified immunity ⋯ does not bar actions for declaratory or injunctive

4    relief." *Los Angeles Police Protective League v. Gates,* 995 F.2d 1469, 1472 (9th Cir. 1993)

5    (quoting *Am. Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818 (9th Cir.

6    1991)).  Plaintiff's Complaint does not seek damages, only injunctive and declaratory relief.

7    Accordingly, Defendants cannot be granted summary judgment on the basis of qualified

8    immunity.

9        **C.    Summary Judgment**

10    Summary judgment is appropriately granted when there are no genuine issues of

11    material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

12    P. 56(c).  The initial burden is on the moving party to show an absence of genuine issues of

13    material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).  If

14    the moving party meets its initial burden, then the non-moving party must set forth specific

15    facts showing a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

16    247-48, 106 S. Ct. 2505, 2509-10 (1986).  In deciding a motion for summary judgment, the

17    court views the evidence of the non-movant in the light most favorable to that party, and all

18    justifiable inferences are to be drawn in its favor.  *Id.* at 255.

19        **1.    Procedural Due Process**

20    The Due Process Clause of the Fourteenth Amendment prohibits the states from

21    "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const.

22    amend. XIV, § 1.  To determine whether a due process violation has occurred, a court

23    engages in a two-step analysis.  First, a court looks to whether the person possesses a liberty

24    interest with which the state has interfered.  *Sandin v. Conner,* 515 U.S. 472, 15 S. Ct. 2293

25    (1995).  Second, if the state has interfered with a liberty interest, a court looks to whether this

26    interference was accompanied by sufficient procedural and evidentiary safeguards.  *See Ky.

27    Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S. Ct. 1904, 1908 (1989); *see also

28    Zimmerlee v. Keeney,* 831 F.2d 183, 186 (9th Cir. 1987).

1    Defendants argue that not only does Plaintiff's confinement at SMU II not implicate

2    a liberty interest, but that even if it does, the classification hearings afford Plaintiff all the

3    "process" to which he is legally "due."  Plaintiff contends that he has been deprived of a

4    liberty interest, and this deprivation occurred without due process.  In particular, Plaintiff

5    appears to argue that the hearings violate his right to due process because they do not respect

6    his right to remain silent.  Even though he admits that the ADOC informs him of that right,

7    Plaintiff argues that his silence is used against him because the only way his classification

8    can be altered is if he breaks his silence by renouncing his gang membership and debriefing

9    prison officials.  Plaintiff also argues that it must offend due process to indefinitely imprison

10   someone in solitary confinement, when that person has not been charged with any

11   misconduct, only membership in a gang.

12   There is no doubt that, in light of the United States Supreme Court's recent decision

13   in *Wilkinson v. Austin,* – S. Ct. –, 2005 WL 1383625 (June 13, 2005), Plaintiff possesses a

14   liberty interest in avoiding transfer to SMU II.  The *Wilkinson* Court reaffirmed its earlier

15   holding in *Sandin v. Conner,* 515 U.S. at 472, 115 S. Ct. at 2293, that an inmate possesses

16   a liberty interest if his assignment to a more restrictive prison setting "imposes atypical and

17   significant hardship on the inmate in relation to the ordinary incidents of prison life.'"

18   *Wilkinson,* 2005 WL 1383625, at *9 (quoting *Sandin,* 515 U.S. at 484, 115 S. Ct. at 2300).

19   Imprisonment in a Supermax facility imposes such a hardship.  *Id.*

20   The conditions in the prison at issue in *Wilkinson,* a Supermax prison in Ohio, are

21   similar in almost all material respects to those in SMU II.  Inmates in both states are assigned

22   indefinitely to the Supermax prison, limited only by the duration of their sentence.

23   *Wilkinson,* 2005 WL 1383625, at *4.   While the inmates in Ohio's prison are entitled to

24   seven hours out of their cell each week, SMU II inmates are entitled to three.  *Id.* at *3.

25   Inmates at both prisons spend the time outside of their cells in a small recreation room.  *Id.*

26   Both prisons severely limit the interaction that prisoners can have with each other.  Neither

27   allows face-to-face communication, and Ohio's appears to prohibit all conversation between

28   inmates.  *Id.*  The cells in both prisons are subject to twenty-four hour illumination, with the

1  lights dimmed at night. *Id.* Due to these similarities, it can no longer be seriously disputed
2  that SMU II inmates have a liberty interest in avoiding placement in SMU II.

3       The next question is whether Plaintiff received the process to which he is legally due
4  prior to his transfer to SMU II, as well as during subsequent classification hearings.
5  In *Mullins v. Stewart,* No. CV-02-1056-PHX-SRB and in *Diaz v. Schriro,* No. CV-03-1498-
6  PHX-SRB, the Court granted the ADOC's motion for summary judgment on the plaintiff's
7  due process claim based on circumstances identical to those in the present case.   Both
8  Plaintiff and the inmates in *Mullins* and *Diaz* challenged the constitutionality under the
9  Fourteenth Amendment's due process clause of the ADOC's validation process and
10  subsequent classification hearings.  The arguments that Plaintiff makes in the present case
11  are virtually identical to those made in *Mullins* and *Diaz*, as is the factual record before the
12  Court.  Just as there were no disputed issues of material fact in *Mullins* or *Diaz*, nor are there
13  here.

14       The Court's decision in *Mullins* and *Diaz* as well as its decision today are bolstered
15  by the Supreme Court's ruling in *Wilkinson.*   After the *Wilkinson* Court held that the
16  conditions in Ohio's Supermax facility implicated a liberty interest, the Court analyzed the
17  procedures by which an inmate is assigned to Ohio's Supermax prison, and adjudged those
18  procedures constitutionally sufficient.   As such, a comparison of Arizona's Supermax
19  placement procedures to those of Ohio is in order.

20       Both prison systems may initiate the transfer of an inmate to the Supermax facility for,
21  among other reasons, involvement in a prison gang.[4]  *Wilkinson,* 2005 WL 1383625, at *4.
22  In both states, the initial decision to transfer a prisoner to the Supermax facility is made at
23  a hearing.[5]  *Id.*  Prison officials in both states provide advance notice to the inmate of the

24  _____

25       [4]Apparently, an Ohio inmate must "lead a prison gang" in order to be incarcerated in
26  the Supermax facility, but the Supreme Court provided no elaboration on that term.
   *Wilkinson,* 2005 WL 1383625, at *4.

27       [5]In Ohio, a three-person panel conducts the hearing and renders a decision, *Wilkinson,*
28  2005 WL 1383625, at *4; in Arizona, it is unclear how many prison officials conduct the

- 9 -

hearing.[6]  *Id.* at 5.  While Arizona permits inmates to call witnesses at their hearings[7], Ohio does not.  In both states, the hearing committee renders a decision in writing which is provided to the inmate.

An Arizona inmate who is validated as an STG member has three options: he may accept the committee's decision and refuse to renounce his STG membership; he may accept the committee's decision and choose to debrief prison officials; or he may appeal the committee's decision to the STG Validation Committee within five days of receiving the committee's decision.  If an inmate chooses the latter option, the inmate's validation file is forwarded to the warden, who reviews it before transmitting it to the validation committee.[8]  The decision of the validation committee is final.

An Arizona inmate's annual classification review affords similar process to the original validation hearing.  Prior to each classification review, the prisoner receives written notice, has an opportunity to present evidence, is informed of his right to remain silent, and receives a written explanation of the reasons for his classification.  A validated STG member, however, can only affect his CCPs by renouncing his gang membership and successfully completing the debriefing process.

Ohio's appeals process is similar to Arizona's.  The first avenue of appeal is to the warden, who may choose to terminate the transfer procedure.  *Id.*  If the warden concurs with the committee, he provides a written explanation to the inmate explaining his reasons for doing so.  The inmate may make a final appeal to the Bureau of Classification Review.

---

hearing, but it is at least two.

[6]In Arizona, that notice comes at least five working days prior to the hearing (Plaintiff received seven days notice before his hearing); in Ohio, at least two days.

[7]An inmate in Arizona may not directly question a witness, but may submit questions in advance of the hearing to the hearing committee.

[8]It is unclear whether a warden who disagrees with the committee's validation decision has the power to terminate the validation process.

The Supreme Court held that Ohio's procedures are "adequate to safeguard an inmate's liberty interest in not being assigned to [the Supermax facility]." *Id.* at *13. In light of the striking similarity of Arizona's SMU II-transfer procedures to those in Ohio, the Court concludes that Plaintiff's validation hearing and subsequent classification hearings afford him a constitutionally adequate amount of process.

As in *Mullins* and *Diaz*, Plaintiff also appears to contend that the initial validation hearing as well as subsequent classification hearings offend his Fifth Amendment right to avoid self-incrimination.[9] U.S. Const. amend. V. Plaintiff contends that because the only way for him to extricate himself from SMU II is to renounce his gang membership and debrief prison officials, he is essentially being compelled to incriminate himself. But even assuming that Plaintiff's supposed Hobson's Choice is tantamount to compelling him to speak, the privilege against self-incrimination is inapplicable in this context.

In *Castro v. Terhune,* the Ninth Circuit flatly rejected the argument that

> the 'debriefing' process, by which prisoners leave the [Security Housing Unit] violates [the] privilege against self-incrimination. [The inmate] is not compelled . . . to debrief; rather he is given the opportunity to receive more lenient treatment from prison officials in exchange for information he has concerning gang activity in prison. Denial of this opportunity as a consequence of refusal to debrief thus does not violate [the inmate's] privilege against self-incrimination.

---

[9]The Fifth Amendment's privilege against self-incrimination applies to the states through the Fourteenth Amendment's Due Process Clause. *See Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 101 S. Ct. 446, 451 (1980).

29 Fed. Appx. 463, 466 (9th Cir. 2002) (citing *United States v. Gonzales,* 897 F.2d 1018, 1020-21 (9th Cir. 1990) (acceptance of responsibility in exchange for sentencing reduction does not violate the Fifth Amendment)).[10]

In *Gonzales,* the defendant argued that a provision of the United States Sentencing Guidelines which enabled judges to exercise leniency for a defendant who accepted responsibility for his crimes violated his right against self-incrimination.  *Id.* at 1020-21. "Specifically, the defendant argued that the only way a defendant who had protested innocence at trial could obtain a sentence reduction was for that person to confess guilt of the original crime and thus admit perjury at trial," thereby causing the defendant to "incriminate himself for further prosecution."  *Galvedon,* 1997 WL 765955, at *8 (citing *Gonzales,* 897 F.2d at 1020-21).

The *Gonzales* court rejected the defendant's argument:

> We begin by observing that the reduction provided for in [the United States Sentencing Guidelines] is merely a benefit which may be accorded to a defendant if he is able to make the necessary showing. The possibility of leniency in the statute does not make denial of lenient treatment impermissible where the district court determines that the defendant has failed to exhibit the requisite contrition.

*Id.* at 1021.

In *Galvadon v. Marshall,* a case also involving the constitutionality of the debriefing process at Pelican Bay, the court expounded on the Ninth Circuit's analysis in *Castro.* The court noted that,

---

[10]While the court in *Castro* does not explicitly identify the prison at issue in that case, the Court infers that the inmate was incarcerated in California's Pelican Bay State Prison ("Pelican Bay"), a maximum security facility that contains a virtually identical policy to that in Arizona concerning the treatment of prison gang members.  *See Galvedon v. Marshall,* 1997 WL 765955 (N.D. Cal. Nov. 12, 1997).  As in SMU II, once an inmate is validated as a prison gang member, he is transferred indefinitely to the prison's Security Housing Unit ("SHU").  An inmate may procure his exit from SHU only be debriefing.  *Id.*

Like the *Gonzales* defendant, a prisoner indeterminately retained in SHU
also has the option to receive more lenient treatment if he debriefs to show
that he has ended his gang affiliation.  Contrary to Galvadon's arguments,
denying a prisoner leniency for refusing to debrief did not punish him for
refusing to talk.  Rather, the denial of leniency recognizes that, by refusing
to debrief, the prisoner shows himself to constitute a continued threat to
prison security as is thus appropriately confined to the SHU.

*Id.* (citations omitted).

Every other district court reviewing Pelican Bay's debriefing process has reached the same result as the courts in *Castro* and *Galvedon*, but with an array of different rationales, many of which are applicable here.  First, an inmate (like Plaintiff) who claims that he is not in a prison gang and has committed no crime or infraction since his incarceration cannot conceivably fear that he could be forced to incriminate himself, as, according to him, he has done nothing wrong.   Such an inmate's problem "is one of impossibility, not self-incrimination." *Hart v. Cambra,* 1997 WL 564059, *7 (N.D. Cal. Aug. 22, 1997).  In that scenario, the inmate lacks standing to challenge the debriefing policy. *Id.* (citing *Powers v. Ohio,* 499 U.S. 400, 410, 111 S. Ct. 1364, 1374 (1991) (ordinarily a plaintiff does not have standing to complain about the deprivations of the constitutional rights of others); *Marchetti v. United States,* 390 U.S. 39, 53, 88 S. Ct. 697, 710 (1968) ("The central privilege for the [Fifth Amendment] privilege's application has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary hazards of incrimination")); *see also Galvadon,* 1997 WL 765955, at *8; *Baker v. Patten,* 1994 WL 665189 (N.D. Cal. Nov. 3 1994).

Second, the "privilege [against self-incrimination] applies when a defendant is compelled to be a witness against himself in his own criminal prosecution or when he is called on to testify in any type of proceeding to answer questions which might serve to incriminate him in any future prosecution." *United States v. Segal,* 549 F.2d 1293, 1999 (9th

1  Cir. 1977) (citing *Lefkowitz v. Turely,* 414 U.S. 70, 77, 94 S. Ct. 316, 322 (1973)).  The

2  ADOC's D.O. 806.06, which covers the debriefing of STG members, states,

> the purpose of debriefing is not to obtain incriminating criminal
> information or evidence against the [STG] member.   The primary
> objective is to learn enough about the member and the STG to: Convince
> the Department that the inmate has dropped out of the STG; Provide
> additional information regarding the STG's structure, activity and
> membership that would adversely impact the STG and assist in
> management of the STG population; Provide sufficient information to
> determine if the inmate may require protection from other STG members
> or suspects.

12  Plaintiff does not cite any evidence, nor even allege, that the testimony he is

13  supposedly being compelled to give would be used to criminally prosecute him, nor does he

14  cite examples from cases or from personal knowledge where testimony given by an inmate

15  at a classification hearing has been used in a criminal prosecution of the inmate giving the

16  testimony, or, for that matter, for any purpose other than those listed in the Departmental

17  Order.  Plaintiff's belief that he may incriminate himself if he is debriefs, even assuming that

18  he possessed any incriminating information, is "merely trifling [and] imaginary," a fact that

19  precludes his right to invoke the privilege.  *See Griffin v. Gomez,* 1995 WL 396857 (N.D.

20  Cal. June 29, 1995); *Medina v. Gomez,* 1997 WL 488588 (N.D. Cal. Aug. 14, 1997); *Hart,*

21  1997 WL 564059, at *7 (citations omitted); *Galvadon,* 1997 WL 765955, at *9; *Castrellon*

22  *v. Gomez,* 1997 WL 361199 (N.D. Cal. June 23, 1997); *Garcia v. Gomez,* 1996 WL 390320

23  (N.D. Cal. July 3, 1996); *Castaneda v. Marshall,* 1997 WL 123523 (N.D. Cal. Mar. 10,

24  1997); *Zarate v. Bunnell,* 1994 WL 374547 (N.D. Cal. June 30, 1994).

25  To comport with due process, a deprivation of liberty must also be supported by

26  "some evidence in the record."  *Superintendent Mass. Corr. Inst., Walpole v. Hill,* 472 U.S.

27  445, 455, 105 S. Ct. 2768, 2774 (1985); *Cato v. Rushen,* 824 F.2d 703, 704-05 (9th Cir.

28  1987).  The "some evidence" standard is "minimally stringent."  *Id.* at 705.  "The relevant

1  question is whether there is *any* evidence in the record that *could* support the conclusion

2  reached by the disciplinary board." *Id.* (quoting *Superintendent,* 472 U.S. at 455-56, 105 S.

3  Ct. at 2774-75) (emphasis in *Cato*)).  Part of the reason for this low standard is "the wide-

4  ranging deference [courts must accord] to prison administrators 'in the adoption and

5  execution of policies and practices that in their judgment are needed to preserve internal

6  order and discipline and to maintain institutional security.'" *Toussaint,* 801 F.2d at 1104

7  (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S. Ct. 1861, 1878 (1979)).

8       Defendants argue that this low standard is met by the following evidence:  the

9  presence of an "STG Specific tattoo of the Warrior Society" on Plaintiff's neck, and the

10  presence of Plaintiff's name on a Warrior Society membership list.

11       Plaintiff's argument appears to be that there is insufficient evidence to justify

12  remanding him indefinitely to solitary confinement, especially when that evidence does not

13  consist of any alleged misconduct, but simply the fact that Plaintiff is a member of a gang.

14  Plaintiff relies heavily on *Koch v. Lewis,* 216 F. Supp. 2d 994 (D. Ariz. 2001), a district court

15  case with virtually identical facts, where the court found that evidence of membership in a

16  prison gang was insufficient to meet the "minimally stringent" *Hill* standard due to the

17  inherent difficulty of determining gang membership combined with the extreme nature of the

18  liberty deprivation.  It is true that *Koch* is indistinguishable from the present case, but the

19  decision in *Koch* is not binding on this Court.[11]

20       The Ninth Circuit's decision in *Bruce v. Ylst,* 351 F.3d 1283 (9th Cir. 2003), which

21  post-dates *Koch* and also involved indeterminate confinement of an inmate based on gang

22  affiliation, serves as binding precedent on this Court.  There, prison officials validated the

23  plaintiff as a gang member based on a report from the local Sheriff's Department, a probation

24  report which stated that the co-defendant in the plaintiff's trial was a member of the same

25  gang, and a statement from a prison informant.  *Id.* at 1287-88.  The Ninth Circuit noted that

26

27         [11]It is worth noting that the Ninth Circuit has vacated the district court's orders in *Koch*

28  "in their entirety."  *Koch v. Schriro,* 399 F.3d 1099, 1101 (9th Cir. 2005).

1  "any one of these three pieces of evidence would have sufficed to support the validation."

2  *Id.* at 1288.  Based on this common sense application of the *Hill* standard, the Court finds

3  that the decision to validate Plaintiff as a member of Warrior Society was supported by

4  "some evidence in the record."

5      It is worth noting that the court in *Koch* seems to stand alone in its interpretation of

6  the *Hill* standard.  District courts, both before and after *Bruce*, consistently grant prison

7  officials' motions for summary judgment where the officials point to evidence, usually very

8  similar to the evidence presented in the instant case, suggesting that the inmate is a member

9  of a gang.  *See, e.g., Wolff v. Hood,* 242 F. Supp. 2d 811 (N.D. Cal. 2002); *Toscano v.*

10  *Gomez*, 1996 WL 571483 (N.D. Cal. Sept. 30, 1996); *Harrison v. McGrath,* 2004 WL

11  1465698 (N.D. Cal. June 21, 2004).  In light of the evidence offered by Defendants, there

12  remains no genuine issue of triable fact with respect to any aspect of Plaintiff's procedural

13  due process claim.

14

15

16

17

18              **2.        Cruel and Unusual Punishment**

19      The Eighth Amendment of the United States Constitution prohibits "cruel and unusual

20  punishment."[12]  U.S. Const. amend. VIII.  To prove an Eighth Amendment violation, an

21  inmate must first show that the conditions of his incarceration deny him "the minimal

22  civilized measure of life's necessities." *Farmer v. Brennan,* 511 U.S. 825, 834-35, 114 S. Ct.

23  1970, 1977-78 (1994); *Hallett,* 296 F.3d at 744.  Next, an inmate must demonstrate that

24  prison officials acted with "deliberate indifference" to his "health or safety." *Farmer,* 511

25  U.S. at 837, 114 S. Ct. at 1979.  Such indifference can occur only if "the official knows of

26

27          [12]The Eighth Amendment is made applicable to the states through the Due Process
   Clause of the Fourteenth Amendment. *Trop v. Dulles,* 356 U.S. 86, 100-01, 78 S. Ct. 590,
28  598-99 (1957).

and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979; *Gibson v. County of Washoe, Nevada,* 290 F.3d 1175, 1187 (9th Cir. 2002). "This 'subjective approach' focuses only 'on what a defendant's mental attitude actually was.'" *Toguchi v. Chung,* 2004 WL 2827667, at *3 (9th Cir. Dec. 10, 2004) (quoting *Farmer*, 511 U.S. at 839, 114 S. Ct. at 1977).

Defendants argue that Plaintiff meets neither of these requirements: Plaintiff offered no evidence that Defendants have denied him any basic necessities such as food, clothing, shelter, hygiene, sanitation facilities, or necessary medical attention; further, Plaintiff has offered no evidence that Defendants knew of any risk to his health or safety. Plaintiff argues that prison officials exposed him to a "substantial risk of serious harm" by forcing him to live in unconstitutionally harsh conditions: twenty-four hour illumination of his cell, almost no exercise, sunlight or fresh air, low caloric intake, almost no socialization with other inmates, shackling even outside of his cell, limited use of the commissary, no access to work, educational or recreational activities, no contact visits with family and friends, limited use of the shower, limited access to music, books and newspapers, demeaning defecation conditions, and indefinite solitary confinement. Plaintiff argues that the Defendants satisfied the subjective component of the analysis based on statements made by former ADOC Director Stewart during a deposition in a previous case, and based on their implementation of the departmental order that requires indefinite solitary confinement of all validated STG members. The Court will separately address each allegedly unconstitutional prison condition.

### a.    Lighting

The Eighth Amendment requires that inmates be given adequate lighting. *Keenan v. Hall,* 83 F.3d 1083, 1090 (9th Cir. 1996). "There is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." *Id*. Plaintiff alleges that his cell is subject

1  to illumination twenty-four hours a day by artificial light, causing stress and sleep

2  deprivation.  While Plaintiff admits that the lights are dimmed at night, he alleges that the

3  lighting is still excessive.

4  　　　　While there is agreement about the dimming of the lights at night, there remains a

5  factual dispute about the adequacy of the lighting.  Plaintiff claims that the lighting causes

6  him stress and sleep loss.  Defendants maintain that the lighting conditions are supported by

7  the valid penological purpose of allowing security checks at all times of the day.  Even if

8  Defendants were able to produce evidence that Plaintiff could sleep in a manner so as to

9  avoid the effects of the light, such evidence would be insufficient to merit summary

10  judgment. *See id.* (affirming denial of summary judgment on the issue of adequate lighting

11  even where prison officials proffered evidence that the inmate would not be affected by the

12  lights if he slept with his head towards the back of his cell).

13  　　　　Satisfied that there are genuine issues of material fact as to whether the illumination

14  of Plaintiff's cell meets the objective prong of the analysis, the Court turns to whether there

15  is a genuine issue of material fact about Defendants' state of mind in keeping Plaintiff's cell

16  lit at all times.  Plaintiff cites testimony from the deposition taken in a previous case of

17  former ADOC Director of Prisons Stewart, where he agreed that "one of the goals of the

18  placement in SMU II after the STG validation was to deter others who might be system [sic]

19  from joining or associating with gang members."  In the same deposition, Stewart also agreed

20  that "one of the goals of [automatic] placement in SMU II after the STG validation" was to

21  "demonstrate . . . the severe sanctions that follow from an STG validation."  Plaintiff also

22  contends that the mere fact that the ADOC automatically confines validated STG members

23  to SMU II evidences Defendants' deliberate indifference to Plaintiff's health and safety.

24  Defendants counter this testimony with an affidavit from an SMU II Deputy Warden who

25  states that there is a valid penological purpose for the lighting conditions in SMU II:  to allow

26  for security checks at any time of day.

27

28

1    As there is a conflict in the evidence both about the adequacy of the lighting in SMU

2    II, as well as about Defendants' intent in creating those lighting conditions, summary

3    judgment is inappropriate for either party.

4                     **b.    Exercise, Sunlight and Fresh Air**

5    Exercise is "one of the basic human necessities protected by the Eighth Amendment."

6    *Lemaire v. Maass,* 12 F.3d 1444, 1457 (9th Cir. 1993).  "Deprivation of outdoor exercise

7    violates the Eighth Amendment rights of inmates confined to continuous and long-term

8    segregation."  *Keenan,* 83 F.3d at 1090 (citations omitted).

9    The parties agree that Plaintiff is allotted three hours of "outdoor" exercise per week

10   in a "recreation area" with a cement floor and walls and a steel grate over the top, although

11   Plaintiff contends that during the winter, he is effectively deprived of the opportunity to

12   exercise, as he is only offered the chance to go to the recreation area early in the morning

13   when he alleges it is too cold.  There is agreement between the parties that Plaintiff is

14   permitted to exercise in his cell.

15   Plaintiff contends that three hours of outdoor exercise is constitutionally insufficient,

16   depriving him of access to sunlight and causing him psychological trauma, including stress

17   and sleep loss.  Defendants argue that the limitations on exercise are justified by the security

18   concern of allowing only one STG inmate in the recreation area at a time.

19   The Ninth Circuit, as well as other circuits, generally refuse to make hard-and-fast

20   rules as to how much outdoor exercise time is required by the Eighth Amendment, as this

21   determination is highly fact-specific and depends upon far more than just the number of

22   hours inmates are allowed to exercise.  *See Caldwell v. Miller,* 790 F.2d 589, 600 (7th Cir.

23   1986) ("The Eighth Amendment does not provide a fixed formula for determining whether

24   the effect of particular conditions constitutes cruel and unusual punishment. . ."); *See, e.g.,*

25   *Davenport v. DeRobertis,* 653 F. Supp. 649, 655-56 (N.D. Ill. 1987) (granting injunction

26   requiring more outdoor exercise after trial where jury heard testimony from medical doctors,

27   psychiatrists, and other professionals about the effects of exercise, and a lack thereof, on an

28   inmate's psychological state).

As a general matter, courts seem to require at least five hours per week of outdoor exercise, although, in some circumstances, a court has approved as little as one hour per week. *See, e.g., Davenport v. DeRobertis,* 844 F.2d 1310, 1315 (7th Cir. 1988) (affirming district court injunction requiring five hours per week of outdoor exercise); *Frazier v. Ward,* 426 F.Supp. 1354, 1367-69 (N.D.N.Y. 1977) (affirming district court decree requiring at least one hour per day of outdoor exercise, weather permitting); *Ruiz v. Estelle,* 679 F.2d 1115, 1151-52 (5th Cir. 1982) (affirming district court decree requiring at least one hour per day of exercise for inmates in administrative segregation); *Bailey v. Shillinger,* 828 F.2d 651, 653 (10th Cir. 1987) (holding that one hour per week of outdoor exercise does not violate the Eighth Amendment).

Based on this survey of similar cases, it appears that while three hours of outdoor exercise per week may be able pass constitutional muster in some circumstances, it is also possible that three hours per week of exercise could fail the objective prong of the test for cruel and unusual punishment.  The resolution of this question requires a deeper inquiry into the circumstances of Plaintiff's imprisonment. *See, e.g., Davenport,* 653 F.Supp. at 655-56; *Frazier* 426 F.Supp. at 1367-69; *Ruiz v. Estelle,* 679 F.2d at 1151-52.

Material questions of fact also remain as to whether Defendants acted with "deliberate indifference" to Plaintiff's "health and safety."  As discussed above, former ADOC Director Stewart's deposition in a prior case could be construed to suggest that the ADOC acted with at least "deliberate indifference" to the health and safety of SMU II inmates, perhaps even with the specific intent to punish them for being members of an STG.  In an attempt to counter this testimony, Defendants offer evidence by an SMU II Deputy Warden that inmates are limited to three hours of outdoor exercise per week because, given the extreme threat that they pose to security, only one inmate at a time can be allowed in the recreation area.  This evidence, while probative on the issue of Defendants' state of mind in imposing this particular condition, is by no means dispositive.  Therefore, denial of both parties' motions for summary judgment is proper.

**c.     Food**

1    "Adequate food is a basic human need protected by the Eighth Amendment." *Keenan,*

2    83 F.3d at 1091 (citations omitted).   To pass constitutional muster, the food must be

3    "adequate to maintain health." *Id.* (quotations omitted).  Both parties agree that Plaintiff

4    receives three meals during the week and two on weekends.   Both parties agree that

5    Plaintiff's diet is reduced in calories due to the sedentary lifestyle Plaintiff is forced to lead

6    as a validated STG member in SMU II.

7         Defendants argue that Plaintiff's nutritional needs, reduced as though they may be by

8    his sedentary lifestyle, are met by the prison's SMU II diet.  Plaintiff counters that he has lost

9    75 pounds since his transfer to SMU II.   Defendants reply that Plaintiff's weight has

10   fluctuated and may be attributable to his other health conditions.  The material facts on the

11   adequacy and effects of the SMU II diet are disputed, and both parties' motions are therefore

12   denied.

13              **d.      Socialization With Other Inmates**

14        Plaintiff argues that he is unable to socialize with or speak to other prisoners.  There

15   is a factual dispute over this issue.   Plaintiff cites to the Standardized Housing Unit

16   Regulations, which state, in section 140.03, subsection 1.11, that "socialization is not

17   authorized for CDU and Level 5 inmates," a subset of prisoners which apparently includes

18   validated STG members in SMU II.   Defendants dispute this contention, citing the

19   Declaration of Carson McWilliams, a Deputy Warden at SMU II, who stated that "[i]nmates

20   in SMU II are allowed to communicate with other inmates in their group from cell to cell,

21   not face to face."

22        Even assuming that Plaintiff is not allowed to communicate with other inmates, it can

23   hardly be considered a "minimal civilized measure of life's necessities" to communicate with

24   other inmates in SMU II, especially when Plaintiff is not barred from various other avenues

25   of communication, such as speaking with visitors in person, speaking on the cellular phone,

26   and speaking to a counselor and other members of the staff.  Plaintiff does not claim that

27   there is no valid penological purpose for this alleged limitation.  On this point, therefore, the

28   Court must grant summary judgment in Defendants' favor.

1

### e.      Shackling Outside of Cell

2       An inmate whom prison officials deem violent may be shackled outside his cell,

3   provided that officials are not "deliberately indifferent" to his "health and safety."  *See*

4   *Keenan,* 83 F.3d at 1091*; Lemaire*, 12 F.3d at 1457 (holding that the district court

5   appropriately rejected an inmate's claim that shackling him while in the shower constituted

6   cruel and unusual punishment).  Plaintiff argues that he is "subjected to overuse of shackles

7   and security devices," but he cites no evidence that the use of the devices amounted to

8   "deliberate indifference" to his "health or safety."  As such, no triable issues remain as to this

9   condition of confinement, and Defendants are entitled to summary judgment in their favor

10  on this point.

11

### f.      Use of Commissary

12      Plaintiff's complaint alleges that he is unconstitutionally denied access to certain items

13  at the commissary such as "food, cold weather clothing, electric razor, lamp, calculator, over

14  the counter medications, playing cards, alarm clock and ice chest."  While the Eighth

15  Amendment gives all inmates the right to "adequate food, clothing, shelter, sanitation,

16  medical care, and personal safety," *Hoptowit,* 682 F.2d at 1246 (quotations omitted), none

17  of the listed items appear to fall within the scope of Eighth Amendment protection.  To the

18  extent that Plaintiff is arguing that the deprivation of "over the counter medications"

19  constitutes improper medical care, Plaintiff cites no evidence of any medical condition he

20  suffers from that was in any way adversely impacted by prohibiting him from buying "over

21  the counter medications."  Nor does Plaintiff argue that he suffered any side effect from a

22  lack of "cold weather clothing."  As such, no triable issues of fact remain as to this prison

23  condition, and the Court will grant Defendants' motion for summary judgment on this issue.

24

### g.      Participation in Work, Educational, Vocational and

25  ### Recreational Activities

26      Plaintiff argues that denying him participation in work, educational, vocational and

27  recreational programs constitutes an Eighth Amendment violation.  It does not, as "idleness

28  and [] lack of programs are not Eighth Amendment violations. . . . There is no constitutional

right to rehabilitation."  *Hoptowit,* 682 F.2d at 1254-55; *Toussaint,* 801 F.2d 1106-07. Accordingly, Defendants' motion for summary judgment is granted on this point.

### h.    Non-contact Visitation with Family and Friends

Plaintiff contends that his Eighth Amendment rights are violated by depriving him of contact visits with family and friends.  His argument fails, as "[d]enial of contact visitation simply does not amount to the infliction of pain."  *Toussaint,* 801 F.2d at 1113.  Therefore, summary judgment in Defendants' favor is appropriate on this issue.

### i.    Showers

The Eighth Amendment's reach extends to a prisoner's basic "sanitation."  *Hoptowit,* 682 F.2d at 1246.  The right to "sanitation" includes the right to shower.  *See, e.g., Toussaint,* 801 F.2d at 1110-1111.  But a prison that limits the number of showers an inmate can take does not necessarily violate an inmate's Eighth Amendment rights unless the number of showers is so limited as to deny the inmate his right to basic sanitation.  *See, e.g., Williams v. Lehigh Dept. of Corrections,* 79 F. Supp. 2d 514, 519 (E.D. Pa. 1999) (limiting an inmate's showers was not an Eighth Amendment violation because it had no effect on the inmate's sanitation); *Davenport,* 844 F.2d at 1316 (holding that inmates experiencing a ninety day lockdown had no right to three showers per week, with Judge Posner noting that, "the importance of the daily shower to the average American is cultural rather than hygienic").  Both parties agree that Plaintiff is limited to three showers per week, and that those showers correspond to the days Plaintiff is allowed to exercise outside.  Nowhere does Plaintiff allege that as a result of this number of showers, he is forced to live in a poor state of sanitation.  Therefore, this aspect of Plaintiff's complaint does not rise to the level of a constitutional problem.

### j.    Limited Access to Music, Books, and Newspapers

Plaintiff argues that he is "limited [with respect to the] newspapers, magazines, and recorded music tapes he can receive," especially when compared to death row inmates, who can receive "twice as many of these items."  (Pl.'s Second Am. Comp. at 4A.)  Plaintiff does not elaborate on exactly how his access to certain reading and music materials is limited, but

1  admits that he has access to a library. It is irrelevant for Eighth Amendment purposes what
2  criteria prison officials use to limit Plaintiff's access to music and reading materials, as the
3  Court can find no case where depriving an inmate of such materials amounted to cruel and
4  unusual punishment. While controlling a prisoner's access to such materials may raise First
5  Amendment and due process concerns, Plaintiff makes no such argument.

6                    **k.    Defecation Conditions**

7           Plaintiff argues that when he has an outside court appearance, he is "subjected to
8  degrading 'defecation watch' confined in a 3x4 closet in SMU II for up to 72 hours, and
9  forced to defecate in a bucket in the presence of staff for 3 times prior to being allowed back
10 to his cell." The Court cannot find any cases directly on point, but courts have declined to
11 extend the Eighth Amendment's protection to similar situations. For example, in *Somers v.*
12 *Thurman*, the Ninth Circuit held that the plaintiff, a male inmate, did not state a claim under
13 the Eighth Amendment where he alleged that female prison guards laughed and made fun of
14 him while conducting body cavity searches and watching him shower. 109 F.3d 614 (9th
15 Cir. 1997). As in the present case, the plaintiff in *Somers* did not allege that the guards
16 "intended to humiliate him," nor did the plaintiff "allege that the searches occurred without
17 any penological justification." *Id.* at 622-23. The mere fact that Plaintiff believes that
18 "defecation watch" prior to court appearances is "degrading" does not raise constitutional
19 concerns.

20                     **l.    Solitary Confinement**

21          Plaintiff incorrectly asserts that the mere fact that he is subjected to indefinite solitary
22 confinement is a form of punishment that raises Eighth Amendment concerns. Solitary
23 confinement raises Eighth Amendment concerns only if the conditions of confinement
24 deprive the inmate of a "minimal civilized measure of life's necessities," including "adequate
25 food, clothing, shelter, sanitation, medical care, and personal safety." *Hoptowit,* 682 F.3d at
26 1258 (citations omitted). While, "in considering whether a prisoner has been deprived of his
27 rights, courts may consider the length of time that the prisoner must go without these
28

1    benefits," *Id.,* the mere fact that the confinement is indefinite does not amount to a

2    constitutional violation.

3                              **m.   Conditions in General**

4        It is not clear whether Plaintiff advances the argument that even if certain conditions

5    are not by themselves violative of the Eighth Amendment, the general conditions at SMU II,

6    taken together, amount to cruel and unusual punishment.  Assuming that Plaintiff makes this

7    argument, it must fail, as "a number of [unrelated] conditions, each of which satisfy Eighth

8    Amendment requirements, cannot in combination amount to an Eighth Amendment

9    violation."  *Toussaint,* 801 F.2d at 1107.

10                            **3.   Retaliation**

11       "A prisoner suing prison officials under section 1983 for retaliation must allege that

12   he was retaliated against for exercising his constitutional rights and that the retaliatory action

13   does not advance legitimate penological goals, such as preserving institutional order and

14   discipline." *Barnett v. Centoni,* 31 F.3d 813, 815-16 (9th Cir. 1994).  Plaintiff argues that

15   Defendants retaliated against him for invoking his Fifth Amendment privilege against self-

16   incrimination by refusing to renounce his gang membership and debrief prison officials.

17   Defendants allegedly punish Plaintiff by continuing to confine him in SMU II until he breaks

18   his silence.

19       Plaintiff's argument fails, for at a minimum, neither the classification hearings nor the

20   STG validation hearing implicate Plaintiff's Fifth Amendment privilege against self-

21   incrimination, for all the reasons discussed above.  While there may be a factual dispute as

22   to whether the classification hearings advance legitimate penological goals, it is irrelevant

23   where, as here, the alleged retaliation does not implicate a constitutional right.  Therefore,

24   Plaintiff's retaliation claim fails as a matter of law.

25       **IT IS ORDERED** denying Plaintiff's Motion for Summary Judgment (Doc. 35).

26       **IT IS FURTHER ORDERED** granting in part and denying in part Defendants'

27   Motion for Summary Judgment (Doc. 50).  The motion is granted with respect to Counts I

28   and III of the Complaint.  With respect to Count II, the aspects of the motion that address the

twenty-four hour illumination of Plaintiff's cell, the restriction on Plaintiff's exercise and outdoor time, and the sufficiency of Plaintiff's diet are denied.  All other aspects of the motion relating to Count II are granted.

DATED this 30th day of September, 2005.

_____
Susan R. Bolton
United States District Judge